Our second case of the day is Mwangangi v. Root. We have one more to go. All right, I think we now have everyone. Ms. Barron. Thank you. Good morning and may it please report. My name is Lisa Barron and I represent the defendant appellant. Ms. Barron. Excuse me. We've got somebody has the YouTube stream on in the background. So we have cross talk. All right. That has now been fixed. I hope. Ms. Barron. Let's start from the beginning. All right. Thank you, judge. Good morning. May it please the court. My name is Lisa Barron and I represent the defendant, Lebanon police officers. Taylor Nielsen, Trey Hendricks, Frank Nolan, Ben Phelps, and the cross appellee city of Lebanon, Indiana. This case is about whether these four officers and Whitetown officer playing route are entitled to qualified immunity for their actions in responding to a dispatch call involving a possible police impersonator late in the evening on October 7, 2017. This call led them to a speedway gas station in Lebanon, Indiana, where they first encountered the plaintiff. Mr. Dottie man donkey detained him for questioning interviewed witnesses carried out a brief investigation and ultimately placed him under arrest for incarceration of law enforcement in violation of Indiana criminal code 35 dash 44.1 dash two dash six. The district courts denial of qualified immunity these four officers and officer route should be reversed for two main reasons. First, because 11 on officers had probable cause to arrest Mr man donkey. And second, in the alternative, they are entitled to qualified immunity, because the alleged right at issue in this case was not clearly established. In particular, it is well settled in this circuit that probable cause is determined by looking to a totality of the circumstances, as known to the officer at the time of the arrest. It is satisfied when a reasonable officer would believe that there is a substantial chance or probability that the suspect has committed a crime. This is not a high threshold, and that has been repeatedly confirmed. Miss Baron in the interest of time, can I ask you a particular question about one of the officers. Yes. And the question I have relates to Officer Frank Nolan. And in particular, can you focus on the facts surrounding the pat down. The second down and viewing those facts in the light most favorable to a plaintiff. The question I have for you is. Couldn't couldn't it be found that that that second pat down, which occurred after the first one. And more importantly, when Mr. Mangaji was handcuffed, violated the Fourth Amendment. All right, so the legal significance of him being handcuffed. In this instance, the legal significance of Mr. Mangaji being handcuffed is a legal determination in this instance as to when the matter transition from an investigatory stop into a full blown arrest. In this instance, that circumstance needs to be reviewed as part of the legal question of whether there is probable cause. And or whether there is qualified immunity, not separately from. And thus, this court's de novo review of those facts doesn't vitiate the probable cause that was collected with respect to any information. Which would have been he had already been searched. OK, I understand the legal side of it, but he had already been he had already been patted down by Officer Root and he was handcuffed. So there's no there's no question he's not free to leave when he's handcuffed, etc. I agree with you completely and we'll sort out whether it's probable cause or not. But what is the what is the legal authority to engage in the second pat down? Given when you view the facts in the light most favorable, it seems to me that Officer Nolan was aware of the first pat down and was aware that the plaintiff was in handcuffs. What's the basis for the second pat down legally? My understanding, based on these facts, the basis comes from at that point, yes, Officer Nolan was aware of the first one. However, Officer Nolan still perceived Mr. Mangangi to potentially be a threat. And it was his position. And I don't think it was clearly established to a reasonable officer in his position that conducting a second pat down on the basis of the belief that any time a suspect is handed from one officer to another, that officer should even when that individual is handcuffed. Yes, Judge, I believe that in this instance, it wouldn't have been clearly established to a reasonable police officer that carrying out this second pat down was unreasonable, even if the individual was handcuffed. Under the circumstances, looking at the probable cause that the officers did possess under this under circumstances at the time they placed Mr. Mangangi in arrest and put him in the back of Officer Nolan's vehicle. Those met the requirements for probable cause. They had sourced, they had information from a reliable, credible witness. They were able to observe the vehicle, which very much appeared to be a police vehicle and had the ability to engage in the actions of which the witnesses described. And it very much would have appeared to a reasonable officer in the Lebanon officers positions, in particular, Officer Taylor Nielsen, that the plaintiff had made a representation that he was a member of law enforcement based upon the manner in which he utilized his vehicle. Had the district court viewed the facts altogether under a totality of the circumstances, the district court should have concluded that there existed probable cause based upon what is a relatively undisputed record that is available through audio and dash And it wasn't apparent to these particular Lebanon officers that what they were doing violated any constitutional rights of Mr. Mangangi. I see that my time is nearing expiration. If there are no further questions, I will reserve the remainder of my time for rebuttal. Certainly, Miss Barrett. Mr. Paul. Thank you, Judge. I want to apologize in advance. I'm going to due to time constraints really have to kind of high point what I think are the issues here. And what is a case that involves a fair number of distinct facts and distinct issues relative to each of the officers and the timing and things like that. I think that first and foremost, I think it's important to note that all of these issues related to qualified immunity and probable cause have a common theme to them. Which is where it's absolute contention that the district court kind of got off of the into into the arena of error here, which is that at the heart of the decision rendered. Is something that the Supreme Court caution courts against doing, which is a fairly hyper technical focus on individual facts in isolation without a greater reference to the totality of the circumstances that are presented to the officers at the time. Mr. Paul, thank you for making that point. That's exactly where I wanted to take you. Can you outline the totality of the facts that were known to officer Blaine Root? Indeed, when he put handcuffs on the plaintiff. Sure, the specific information that he knew, and this is identified on page 7 of our reply briefing in the briefing. The specific information that he knew was that an identified 911 caller had reported that a blue Crown Victoria with the license plate number SR 393 had attempted to pull him over on the interstate by flashing strobe lights. The Crown Victoria was headed in the direction of Lebanon, Indiana 3, the same 911 caller spotted the Crown vacant gas station in Lebanon and pulled nose to nose with another vehicle and for that. The Crown vacant gas station in Lebanon matched the description of the vehicle and bore the same license plate as identified by the 911 caller. Are you certain that the police dispatches contain as much detail as you just described? Maybe I don't know if Mr. Bolesky wants to speak to that, but I read the dispatches. My memory of them is that they don't contain the details that you just added in your summary. Well, I think the dispatches do, and I think if you look at the record as a whole, as the district court order laid out, that was actually, I think, if I recall, I'm sorry, I don't have this photo right in front of me, but if I recall, that was actually taken from the district court order. I wouldn't know that the district court used the common knowledge doctrine with respect to imputing a lot of this on these officers. Now that that finding it. I don't think it's before the court on this appeal as identified in our brief. But additionally, as as identified in our in officer roots testimony, what what he knew, he knew most of that firsthand, he didn't have that wasn't necessarily had to be imputed on him based on the common knowledge doctrine. But the dispatches, I don't think the common knowledge, the collect, it's not the collective knowledge doctrine. I don't see how it applies to officer root at the time of the handcuffing. I think that's correct. I would agree with that. Okay. So that would, that would mean that whatever officer Nielsen's knowledge was doesn't can't be imputed to him because she, because she didn't have that common knowledge. You know, she was there first. She looked in the car, et cetera, et cetera. You know, the fact pattern. So, so that would, that leaves you, that leaves officer root with the content of the transmissions. Yeah, and as he identified in his depot, he knew that an Indian state police had unsuccessfully attempted to locate the vehicle. And it was believed the same suspected vehicle ended up at the gas station. That was from roots. That was from depth of testimony. So the 1st set of facts I read to you, I think, was directly from the order in the visitor court order in this case. So, how does the totality of the police dispatch information, how does that supply a basis to place the plaintiff under arrest? Well, and that's, that's where we take issue with the district court's determination as to the when an arrest occurred. Now, in this case, the question of whether or not it was appropriate. Now, there's no doubt he's arrested when he's putting handcuffs. Well, I, again, I think that the cases we cited that are, and again, we, this, this argument was contained both in our appellate brief and our apply in the appellate brief from 20 to. In the interest of time, just explain to me how the police dispatch information. In its totality, which is the entirety of what officer route new. How does that amount to probable cause to arrest? Now, well, we have to just answer the question. You don't need to reference pages. I've read them all. Okay, the, the, our contention is, is that the arrest did not occur that the Terry stop was not transformed into a custodial arrest simply by virtue of placement of the handcuffs and the brief pat down that occurred, which we, which we identify more specifically. Now, the probable cause, so the handcuffing, the handcuffing in your view is part of a lawful Terry stop in the totality of these circumstances. Correct. That's correct. That's correct. Judge. And I'm going to, and I'm going to reserve the remainder of my time for rebuttal as well. I apologize. We didn't get too deeply into this, but I'm going to reserve the remainder of our time for rebuttal. Certainly. Mr. Paul. Mr. Belsky. You are muted. Mr. Belsky. You are still muted. Excuse me, Your Honor. I apologize. My name is Ed Bielski. I'm an attorney who represents Dottie Mungangi with regard to this matter, although it's not permitted necessarily outlined in the rules. I have a cross appeal that I would like to reserve one minute of time at the end for rebuttal if it's acceptable to the court. I think you need to discuss this cross appeal now. Because I have serious doubt whether there is appellate jurisdiction over it. That appeal is assertively based on a Rule 54B partial final judgment by the district court. Rule 54B partial final judgment is permissible with respect to any given litigant only if all claims with respect to that litigant have been resolved. In other words, for this appeal, only if the city is 100% out of the case in the district court. Is that condition satisfied? Your Honor, my understanding of the application of Rule 54B would be that they are distinct issues, not that they are all resolved. No, that's not correct. It is particular claims with respect to all parties or all claims with respect to one party. You're using the with respect to one party branch, so I wish you would answer my question rather than quarrel with the basis of my question. Are all of the claims against the city fully resolved in the district court? No, they are not, Your Honor. In the district court, there is a Monell claim that's pending with regard to the handcuffs. Yep, that's what I thought. Well, you can argue the cross appeal if you want, but it doesn't look like the conditions for appellate jurisdiction are satisfied. Okay. In that case, let me move directly to the issues associated with the arrest that my opposing counsel have recently spoken to. I think the court has identified the important issue here. Obviously, at the time of the cuffing, this is an arrest. When you're asking what is actually known at the time of the arrest, the answer is nothing. If we look at the actual dispatches, they don't say anything other than there's a vehicle that is a possible police impersonator. And at some point, this person followed someone at some point and some place for an unspecified period of time. That's not illegal. That's not a crime. That's nothing. Mr. Boleski, they do have the vehicle, right? I mean, the vehicle was obvious when they pulled into the gas station, and the vehicle at least looked like it could be an unmarked police car, right? Two things, Your Honor. Yes, of course. So, let me just pause for one second. So, when Officer Root shows up at the Speedway gas station, he has the police dispatches, and he pulls in, and he sees what appears, or at least what could appear to be, an unmarked police car sitting in the gas station, not near a pump, right? No, actually at a pump, Your Honor.  It was stopped at a pump. He pulled forward. I didn't think he was there to get gas. I thought he was there to jump another car. Two things, Your Honor. Yes, he was there to jump another car. After he jumped the car, he immediately pulled forward, stopped at the pump with the intention of, A, filling up his car, but before that, he had to fill out some paperwork with regard to the run he had made to help the car. As he was sitting there, Officer Nielsen pulled in directly behind him and turned on a red and blues and seized him, but he was planning on getting gas. He was stopped at a pump, doing nothing, just sitting there about to get out of his car when he was surrounded by seven police cars. So, in terms of the things that the officers know, I also absolutely, there's no doubt, we do not dispute that this vehicle matched a vehicle that was identified in the dispatches. But, as just recently, Justice Ginsburg pointed out in the jail versus Florida case, or it could be Florida versus jail, I'll apologize if I'm misstating that, identity is not the ultimate standard or the only standard. Conduct is important, and in this situation, they had no conduct. They had no illegal conduct. They didn't even know that a crime, whether a crime had been committed. The difficulty, Mr. Biel, I think you have to focus on what particular officer you have in mind. One of the complexities of the case is that they played different roles and they knew different things. So, Officer Root, for example, is not situated the same way Officer Nielsen is in no small part because of the things Officer Nielsen saw in the car, as Judge Kirsch is referencing. Right, and I would agree with that. In terms of, she did have 10 seconds of view in the car. Both of them saw a sedan. It's certainly not illegal to drive a sedan in Indiana, or to look like an unmarked police car in the police car. You got to deal with the other stuff. Help me out. Tell me what you were looking for. No, no, no. So, here's the concern that I have, the overarching concern that I would benefit from you addressing, is separate and apart from whether, just as a straight up matter, there's probable cause to arrest on this fact pattern. There's a qualified immunity issue in the case. The Supreme Court has said a lot about qualified immunity in recent years, especially about prong two of the qualified immunity analysis. As I read the district court opinion, which is lengthy, there are five lines devoted to prong two of the qualified immunity analysis. They appear on appendix A61. And the prong two analysis is stated in terms of the right to be free from an arrest without probable cause. Is that the right level of particularity at which to state the prong two analysis? Yes, Your Honor, in this case it is, because it is an obvious case. In terms of the law, the law has to be clear, and the right has to be clear. Admit it. But the right to not be arrested without probable cause is absolutely a well documented right, and we all know that. But hasn't the Supreme Court said, look, you just shouldn't, you can't parrot general legal standards and say, Terry versus Ohio is clearly established, the reasonable suspicion standard. You've got to state the question informed by the facts and circumstances around the challenged conduct. Yes, Your Honor. Okay, and the moment that you do that here, I think, for example, with respect to Officer Nielsen, I think Officer Root is a different, the facts are different. But with respect to Officer Nielsen, you have to ask that question, the probable cause question, informed by what she saw in the back of the car. Right. Let me address that in two different ways. First, Your Honor, with regard to the Supreme Court opinions of late, I would note that most of those deal with unreasonable force in that context, as opposed to this. Here we have a clear statute. You've been as clear as day. You're not going to persuade us on that. Keep going. In terms of this statute, Your Honor, the issue is how it's written within the statute. The statute specifically speaks to three issues. One, there has to be an actual representation. Two, that representation must be that you were a policeman when you're not. And three, there has to be some evidence, some evidence that you intended to hold yourself out as a policeman. When she arrived in the car, yes, she does have 10 seconds of looking in there. But what does she observe? She doesn't observe any representation. She doesn't observe anything other than a flashlight. Counsel, I must say I'm worried about that. Are you saying that before an officer can arrest anyone for anything, she has to psychoanalyze the suspect in order to know what's in the suspect's head? We have a lot of cases that say that officers can make arrests and leave questions of intent to be sorted out by a judge and jury. You seem to be disagreeing with that. That's a pretty hard burden for you to carry. Well, Your Honor, let me clarify for certainty. I'm not suggesting that you have to prove intent like you would in a court. But the case law in the Seventh Circuit indicates there must be some indication, some evidence of intent. In this situation, that intent has to be related to an actual representation. Why isn't it implicit from what Officer Nielsen saw? A crown Victoria with strobe lighting, in addition with some things inside that an individual is a law enforcement officer. The reflective vest, the flashlight, the log book, the orange cones, etc. What she thought, mistakenly, radar detection equipment, things like that. Why isn't that enough? It's not, Your Honor, for a couple of reasons. First, let me clarify one thing in the record. She didn't observe strobe lights. No one observed strobe lights. There was no strobe lights on when they arrived. So that's first and foremost. Fair enough. Speak to badges, marked cars. You can't give a ticket on the road unless you have these issues. With regard to the lights, fine, there's strobe lights. But all lights, all cars have blinking lights. In Indiana, the law is very specific. The only way you can represent yourself as a police car is by way of either insignias or red and blue emergency lights. By statute, they are exclusive to police officers. So when she arrived, she may have seen some things that I have in my car, you have in my car, and the police may have in their car. But she didn't see anything that indicated that this person had held himself out as a police officer. Moreover, if you look at Seventh Circuit case law, there can be situations where someone has a perfectly legal item. But that legal item, unless it's observed doing something illegal, then that can't be the basis, the full basis upon which probable cause is based. Finally, when you're talking about this in terms of reports, and they didn't have any real reports other than there was a possible police impersonator, there has to be some kind of indication that the report matches the thing they observed. No one saw him using cones and thought he was a police officer. No one saw him losing a flashlight and thought he was a police officer. Those are just items that she observed in the car. And here the issue is not reasonable suspicion, it's probable cause. There has to be some indication that an actual crime has been committed. In fact, if you look at Sergeant Phelps, Sergeant then now Lieutenant, when he arrived, which is basically within the same group of seconds, he had gotten out of the car, or I think he had just gotten out of the car, he didn't believe there was enough information to even indicate that a crime had been committed. As a result, there is no indication of probable cause based on what she saw in the car. Well, they caucused, or they had a little gathering, and he later changed his view, did he not? I think it was Phelps and Officer Nielsen that were the ones that made the call to take him to the station house. After the arrest, yes, they did. There was a discussion well after the arrest. The arrest occurred at the time he was cuffed. This has already been determined, and that matter is not before the court. What was the alternative of taking him to the police station? Well, there would have been... What's that? I'm sorry, say it again, Aaron. What was the alternative to taking him to the police station after, according to you, he had been arrested? Well, after he's arrested, the police are going to charge... I'm not sure I understand your question. They could have released him, right? It was either take him to the police station or release him, right? That's what they were talking about. I don't think there was any talk about that. In fact, Your Honor, if you look at the actual transcript, they admitted before they even knew his name, what he did for a living, why he was there, why he was in Lebanon, why the car was that way. They had already decided that he was going to jail. That was specifically discussed during that little conference. You have to combine two pieces of tape to get that. But they had decided, no, no, no, no, he's going to jail. And that's another point. It's not just the cuffing that identifies that binary moment, arrest or not. There's the cuffing. There's the second frisk, which is based on a policy associated with a prisoner. There is the admission that he's going to jail before they even talk to him. There's the merandizing him when he's in cuffs. And then there's the refusal to loosen the cuffs when he's no danger and he's saying they're hurting him. I see that I'm out of time. Are there any other questions before I stop? Thank you very much, counsel. Thank you. Anything further? Yes, Judge, if I may, I would just like to briefly touch upon a few key issues that have come up, namely in response to the qualified immunity arguments that all officers are making in this instance. Even if we assume that the probable cause was lacking, the decision that Officer Nielsen made was after she had completed several things on scene and doesn't occur until 16 to 18 minutes into her dash cam video when she finally confers with Sergeant Phelps about what she's going to do. And you need to look at what information was in her mind at that time, forming her basis, especially with respect to a statute that I would disagree is clear. The statute is not clear. It doesn't have a lot of case law interpreting it. And the absence of a lot of case law interpreting it further signals the need to go to the clearly established prong of the qualified immunity analysis because the legal landscape is not clearly settled with respect to what it means in the state of Indiana to hold oneself out as a member of law enforcement. And it's for those reasons that the district court's denial of qualified immunity to 11 officers should be reversed. Thank you. Thank you, Mr. Paul. Anything further? Briefly, Judge, I want to note that Mr. Bielski's argument sort of demonstrated the real problem with this case, which is that this concentration on all of these facts in isolation to all the other things that are going on both before and after the stop occurred is really where the district court's order and the basis of the district court's order was problematic. And to your point, Judge, that the notion that a representation was made under the criminal statute that the issue here is really it's really a stretch to say that no reasonable officer would have believed that a representation was made, especially after they spoke with a witness. Now, we didn't talk a lot about this in any of the presentations here, but the witnesses were on the seat and within a few moments of arriving there, the officers were talking to the witnesses about what happened. And so when we when we look at this probable cause certainly existed then and the actions were appropriate at all points of the encounter prior to that. I see my time expired. If anybody doesn't have any questions, I appreciate the judge's time. Thank you very much. The case is taken under advisement.